UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
VINCENT GRAMUGLIA,

                     Plaintiff,

                                             **COMPLAINT**

-against-

                                             **Jury Trial Demanded**

THE THOMAS CORNERS FIRE DEPARTMENT,
GLENVILLE FIRE DISTRICT #7, DAN VLAINICH, and
GARTH RICCIO,

                                          No. 1:25-CV-0661 (AMN/DJS)

                     Defendants.

---------------------------------------------------------------------------X


     Plaintiff, VINCENT GRAMUGLIA, by and through his attorneys, FAMIGHETTI & WEINICK, PLLC, alleges upon knowledge as to himself and his own actions, and upon information and belief as to all other matters, as follows:

**JURISDICTION**

     1.    This is a civil action based on Defendants' violations of Plaintiff's rights guaranteed to him by the First and Fourteenth Amendments of the United States Constitution (as enforced by 42 U.S.C. § 1983 ("Section 1983")), the Age Discrimination in Employment Act ("ADEA"), and Americans with Disabilities Act ("ADA"), the New York State Human Rights Law, and any other cause of action which can be inferred from the facts set forth herein.


     2.    Jurisdiction of the Court is invoked pursuant to 28 U.S.C. §§ 1331, 1343. Supplemental jurisdiction is invoked over State and local causes of action pursuant to 28 U.S.C. § 1367.

3.     Venue is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district and in Schenectady County.

**PARTIES**

4.     Plaintiff Vincent Gramuglia is a resident of the Town of Glenville, Schenectady County, New York.

5.     Defendant Glenville Fire District #7 ("Glenville" or the "District") is a municipal fire district, organized pursuant to the laws of the State of New York, with a principal place of business in Schenectady County, New York.

6.     Glenville is responsible for providing fire protection services for the businesses, residents, visitors, and structures within its defined borders.

7.     The District is a municipal government run by five commissioners elected by citizens who reside within the boundaries of the District.

8.     Defendant Thomas Corners Fire Department, Inc. ("TCFD" or the "Department"), is an organizational sub-unit of Glenville and a New York State not-for-profit corporation.

9.     The TCFD is comprised of volunteer firefighters.

10.    Though TCFD is organized pursuant to its by-laws and New York corporate law, the District is ultimately responsible for the fire protection services provided by TCFD.

11.    As an example of the relationship between the entities and the oversight role the District maintains over TCFD, the members of TCFD "elect" their chief officers, but the District must technically approve those votes and make the appointments.

12.    Further the District, not TCFD, provides worker's compensation insurance for the members, and it owns all the equipment and fire trucks used by the firefighters.

13.    Dan Vlainich was, at relevant times, Chief of TCFD, making him the Chief Executive Officer of the Department.

14.    To reiterate, though the members voted Vlainich as chief, pursuant to New York State Law, the District must legally appoint Vlainich as chief.

15.    Though the District may exercise its independent discretion and choose to appoint Vlainich, or anyone else, it chose to appoint Vlainich.

16.    Garth Riccio was, at relevant times, Assistant Chief of the TCFD.

17.    Like Vlainich, the members elected Riccio, but appointment to the position of

Assistant Chief is made by the District.

18.     Riccio and Vlainich are residents of the State of New York, County of Schenectady.

## PROCEDURAL HISTORY

19.     On or about April 5, 2024, Gramuglia served on Defendants a notice of claim.

20.     More than thirty days have elapsed and Defendants have failed and/or refused to make adjustment on Gramuglia's claim.

21.     On or about April 16, 2024, Gramuglia filed a charge of discrimination with the New York State Division of Human Rights.

22.     On June 24, 2024, Gramuglia withdrew his claims from the Division of Human Rights.

23.     On June 26, 2024, Gramuglia filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

24.     The Charge expressly alleged age discrimination.

25.     On November 20, 2024, Plaintiff filed an amended charge of discrimination.

26.     In their Position Statement, Defendants submissions suggested that Defendants made adverse employment decisions based on Vlainich's belief that Gramuglia had a medical condition with his knees.

27.     Accordingly, Plaintiff argued to the EEOC that these admissions showed disability discrimination and a failure to accommodate.

28.     The EEOC preliminarily investigated the claims, including reviewing the parties' submissions.

29.     On March 11, 2025, the EEOC decided it would not "further investigat[e]" the case, it made no determination about the merits of the case, and it issued a notice of right to sue. Ex. A.

## FACTS

30.     Gramuglia is a male, aged 73.

31.     In 1968, Gramuglia joined the Fort Lee Fire Department, marking the beginning of a long career in the fire service.

32.     In 1969, Gramuglia proudly served the country as a paratrooper in Vietnam.

33.     Returning from Vietnam, in 1970, Gramuglia trained and certified as an interior firefighter, serving with the Fort Lee Fire Department.

34.     Gramuglia actively served with the Fort Lee Fire Department through 1980, and responded to countless structure fires, vehicle fires, motor vehicle accidents, gas and haz-mat incidents, and medical emergencies, among other emergency responses.

35.     In March 2008, Gramuglia joined the TCFD.

36.     Through its history, TCFD has had only approximately 25 active duty members, at any given time.

37.     Of those active duty members, roughly only half routinely respond to emergency calls and only six or seven are qualified to drive the emergency vehicles.

38.     In other words, TCFD is in desperate for help.

39.     Though members of TCFD, including Gramuglia, volunteer their time and receive no salary, TCFD members, including Gramuglia, receive other benefits of membership such that they are considered employees under federal and state employment statutes, including Title VII, the ADEA, and the New York State Human Rights Law.

40.     For example, TCFD provides to its members a Length of Service Award ("LOSAP"), which is, in effect, a pension.

41.     In addition, TCFD members, including Gramuglia, are eligible for property tax credits and are eligible for disability insurance benefits, life insurance benefits, and workers compensation benefits.

42.     Gramuglia completed Firefighter 1 training, an entry level firefighter training course which meets a national firefighting standards curriculum.

43.     Among other things, Firefighter 1 trains students to use Self-Contained Breathing Apparatus ("SCBA"), which in turn, qualifies firefighters as "interior status," meaning they can enter structure fires to extinguish the fire and search for victims, among other mission critical responsibilities.

44.     By contrast, "exterior" firefighters are limited to working outside of a structure fire, and cannot enter a building which has air conditions which are dangerous to life, and therefore, they cannot protect life and property to the extent that interior firefighters can.

45.     Gramuglia has performed his job responsibilities as an interior firefighter with TCFD in an exemplary manner.

46.     Recognizing his exemplary skills and service, in January 2023, the members of TCFD elected Gramuglia as Lieutenant, i.e. the members chose Gramuglia to "lead them into battle."

47.    Then, in April 2023, the members elected Gramuglia to the administrative office of Vice President, further demonstrating the members' trust in Gramuglia's leadership.

48.    Also in April 2023, Vlanich suspended eleven members, including Gramuglia.

49.    The suspensions were for a variety of reasons, but essentially each member was suspended without warning for violating newly enacted operating procedures.

50.    Vlainich enacted the alleged operating procedures without the District's approval, thus, the procedures were not lawfully implemented, and indeed, the District explicitly ruled that the procedures were not effective.

51.    Upset by the suspensions and the impact it would have on the District's fire protection mission, Gramuglia attended a public meeting of the District's commissioners on May 10, 2023.

52.    Gramuglia, as a member of the community, voiced his concerns to the Commissioners about the impact that the suspensions would have, given that nearly two-thirds or more of the active members of the fire department were suspended.

53.    To be sure that Gramuglia was speaking as a citizen, meetings of the Commissioners are open to the public.

54.     But, the Department follows a strict chain of command, which from bottom to top, is essentially: probationary firefighter, firefighter, lieutenant, captain, assistant chiefs, chiefs, commissioners.

55.     As a paramilitary organization, members follow commands from the top down, and relay information conversely, from bottom to top.

56.     In other words, if a firefighter were need of training, equipment, or needed some other assistance or resource from the Department/District, the firefighter would bring that concern to a lieutenant, not to the chiefs or commissioners, even though the ultimate decision may have to be made by the chief or commissioners.

57.     Thus, when Gramuglia spoke to the commissioners, he was speaking as a citizen, not as a firefighter.

58.     Though the meeting was a District meeting of the Commissioners, Vlainich, who is an officer of the TCFD and in his capacity as an officer of the TCFD, publicly fired back at Gramuglia, showing his animus towards Gramuglia.

59.     Later in May 2023, Gramuglia completed the drill allegedly required by the Chief and was then returned to active duty.

60.     On September 11, 2023, Gramuglia responded to an emergency with the fire

department.

61.    Gramuglia drove the fire truck.

62.    As driver, Gramuglia did not immediately wear an SCBA because his responsibilities required that he operate the fire truck at the scene, not enter the building.

63.    In this case, however, Gramuglia was the only firefighter on the fire truck trained to use an SCBA.

64.    Accordingly, upon his arrival, Vlainich ordered Gramuglia to don an SCBA and enter the structure.

65.    Thus, as of September 11, 2023, Gramuglia was plainly qualified to use an SCBA.

66.    On September 13, 2023, the commissioners held a regular meeting.

67.    At the meeting, Chief Vlainich provided a report to the commissioners.

68.    Vlainich's report stated that Gramuglia failed to successfully complete a training relating to use of the SCBA.

69.    Vlainich falsely reported that Gramuglia told him that he could not complete the

training because of fatigue and age.

70.     He further falsely reported that Gramuglia said he could not complete the training because his knees hurt from a cortisone shot.

71.     Gramuglia did not say any such thing.

72.     Moreover, even if true that Gramuglia did not complete the training, the training was a routine drill, not a qualification, meaning that completion of the drill was not a requisite to maintaining qualification to use an SCBA.

73.     Notwithstanding the false statement about Gramuglia's comment and the fact that the drill was not required to be completed to maintain SCBA qualification, Vlainich reclassified Gramuglia from interior firefighter to exterior.

74.     Indeed, Vlainich could not identify to the commissioners any rule, procedure, or national standard which compelled Vlainich to reclassify Gramuglia, instead asserting that the re-classification was done "to protect both the individual and other members of the Department."

75.     Vlainich further asserted that Gramuglia claimed he could not complete the drill because he is "too old."

76.     Gramuglia said no such thing and of the several alleged witnesses to give

statements to the District about the incident, Vlainich is the only individual to assert that Gramuglia said anything about his age.

77.     Moreover, neither Vlainich nor anyone else from the Department or District told Gramuglia that he was reclassified.

78.     Accordingly, Gramuglia continued to respond to calls, and continued to perform the duties of interior firefighter.

79.     On October 4, 2023, the Commissioners held another meeting.

80.     At this meeting, Vlainich reported further false information to the Commissioners about Gramuglia.

81.     Vlainich told the Commissioners that Gramuglia agreed to remain an exterior firefighter and would not seek reclassification to interior.

82.     In late October, Vlainich sent a text message to all members of the Department instructing them to check their personal accountability tags ("PAT") on their gear.

83.     PAT tags are used to account for firefighters at a fire.

84.     TCFD uses different colored PAT tags to identify whether firefighters are

designated as interior or exterior.

85.    After Vlainich's text, Gramuglia checked his firefighting gear and discovered that his PAT tag indicated he was an exterior firefighter.

86.    Confused, Gramuglia spoke to Terri Petricca, secretary to the Commissioners, and Commissioner Edward Wierzebowski, who conveyed the foregoing, to wit, that Vlainich told the Commissioners that Gramuglia had elected to become an exterior firefighter.

87.    Upset, Gramuglia spoke with Assistant Chief Riccio, who was also at the firehouse.

88.    Riccio told Gramuglia to "live with it," confirming that the decisions were not Gramuglia's, but were imposed on him by the Chiefs.

89.    In early November 2023, Gramuglia met with ex-Chief Greg Petricca, Commissioner Wierzebowski, Chief Vlainich, and Assistant Chief Riccio.

90.    Gramuglia confronted them about the false statements concerning his alleged decision to commit to exterior firefighting only.

91.    Vlainich confirmed that he never heard Gramuglia make such an agreement and alleged that he heard it from Riccio.

92.    Riccio continued to allege that Gramuglia told him that he wanted to be exterior only, but Gramuglia adamantly denied it and insisted on returning to interior status.

93.    Vlainich and Riccio refused to re-classify Gramuglia, confirming that his decision was not Gramuglia's, but rather was imposed on him by Vlainich and Riccio.

94.    In early December 2023, Gramuglia sent a letter to the Commissioners.

95.    The letter stated, among other things, that the Chiefs' comments about Gramuglia's exterior status were false and that Gramuglia was being treated differently than other firefighters, which he believed o be based on his age.

96.    Greg Petricca, Rick Conley, and Tim Graves, who are at least 10 to 15 years younger than Gramuglia, did not attend the drill which Vlainich alleged Gramuglia did not complete.

97.    Vlainich, however, did not suspend, punish, or re-classify Petricca or Graves, whereas Vlainich both suspended then re-classified Gramuglia.

98.    The Commissioners took no action with respect to the letter.

99.    On January 10, 2024, however, the Commissioners held a regular meeting.

100.    At the meeting, Vlainich admitted to the Commissioners that (1) the SCBA drill for which Gramuglia had previously been disciplined, was merely a goal and (2) Vlainich did not intend to revoke the interior status of "several members" who did not meet the goal.

101.    Notwithstanding these admissions, as of the second week of January, Gramuglia's status had not changed.

102.    Accordingly, Gramuglia hired a lawyer.

103.    On January 14, 2024, Gramuglia responded with the fire department to an emergency call for an electrical fire in a house.

104.    Upon arrival, it was clear that no active fire existed.

105.    Indeed, the house had no smoke in it and no indications for use of an SCBA were present.

106.    When such non-hazardous conditions exist, any firefighter may enter the structure, regardless of whether the firefighter is designated interior or exterior.

107.    Gramuglia asked Chief Vlainich for his orders.

108.    Vlainich ordered Gramuglia to use a thermal imaging camera to check an electrical outlet in the house for heat, i.e. Vlainich ordered Gramuglia to enter the house.

109.    Gramuglia followed instructions, took the camera, entered the home, and confirmed that the outlet was not hot.

110.    Upon their return to the firehouse, Vlainich told Gramuglia that he wanted to speak to him "in the back," i.e. in his Chief's office.

111.    Gramuglia said that he had escalated the situation to his lawyer.

112.    Later that day, Vlainich text messaged Gramuglia that he was suspended.

113.    On January 15, 2024, Vlainich sent to Gramuglia a letter indicating that Gramuglia was indeed suspended until the next commissioner's meeting scheduled for February 14, 2024.

114.    The letter did not identify a charge or reason for the suspension.

115.    On January 23, 2024, Gramuglia's attorney sent to Vlainich a letter demanding Gramuglia's restoration to interior status.

116.    On January 26, 2024, the District's attorney responded to the lawyer confirming

that Vlainich had "concerns of Mr. Gramuglia's ability to wear an air pack."

117.    The attorney noted that such concerns allegedly arose at least on November 7, 2023, the purported date of reclassification.

118.    Yet, less than two months earlier, on September 11, 2023, Vlainich had ordered Gramuglia to wear an SCBA into a structure with a potentially unsafe breathing environment.

119.    In other words, Vlainich could not legitimately believe that Gramuglia could not wear an air pack on November 7, 2023.

120.    Gramuglia attended the February 14, 2024 commissioner's meeting.

121.    Gramuglia told the commissioners that he was claiming "defamation and discrimination," and that he had hired an attorney.

122.    Among other things, Gramuglia demanded reinstatement to interior status.

123.    The Commissioners deliberated Gramuglia's status vis-a-vis his exterior/interior status, and his suspension.

124.    The Chief lobbied the Commissioners to continue the suspension, questioning specifically, "letters and communications with lawyers."

125.    On March 13, 2024, the Commissioners held a meeting.

126.    Gramuglia spoke at the meeting and questioned, among other things, why other members who did not complete SCBA training were exempted from the requirement, whereas Gramuglia was reclassified.

127.    In other words, yet again, Gramuglia complained of disparate treatment, i.e. discrimination.

128.    Then, Commissioner Graves announced that Chief Vlainich wants individuals who make comments about him to direct those concerns to him.

129.    In other words, Graves conveyed Vlainich's displeasure with Gramuglia's handling of his complaints of discrimination.

130.    The Commissioners again took no action with respect to Gramuglia's interior/exterior status.

131.    On April 18, the Commissioners held another meeting.

132.    The Commissioners voted to lift the suspension, and to return Gramuglia to "interior status."

133.    Despite the Commissioner's directions, Vlainich refused to reinstate Gramuglia.

134.    Accordingly, on April 20, 2024, the Commissioners convened an "emergency meeting" to address Vlainich's refusals.

135.    In defiance of their order, Vlainich confirmed to the Commissioners that he would not be returning Gramuglia to interior status, confirming Vlainich's animosities towards Gramuglia.

136.    The Commissioners voted to suspend Vlainich and to reinstate Gramuglia to interior duty.

137.    On June 26, 2024, Gramuglia filed a charge of discrimination with the EEOC alleging age discrimination against Defendants.

138.    On July 25, 2025, the EEOC requested that Defendants submit a position statement.

139.    On August 21, 2024, Defendants submitted their position statement.

140.    On September 30, 2024, Defendants, via Fire Department President Patricia Murray, demanded that Gramuglia appear at a disciplinary hearing the very next day, on October

1, 2024.

141.    In other words, Respondent deprived Gramuglia of a fair opportunity to defend himself.

142.    Based on a letter Gramuglia's lawyer sent to Defendants, the hearing was initially adjourned, sine die.

143.    But, on a Saturday, November 16, 2024, Defendants resurrected the charges and demanded that Gramuglia again appear at a disciplinary hearing, unilaterally scheduled for the upcoming Monday, November 18, 2024.

144.    The charges stemmed from an alleged incident which happened in August 2024.

145.    In other words, no urgency existed requiring a hearing be held on just two days notice over a weekend to Gramuglia, suggesting a retaliatory motivation.

## FIRST CLAIM
### (First Amendment Retaliation – via 42 U.S.C. § 1983)

146.    The individual defendants, Vlainich and Riccio, acting under color of law retaliated against Gramuglia based on his speaking on matters of public concern, including but not limited to fire department staffing issues.

147.    The District and TCFD are liable pursuant <u>Monell v. Dep't of Social Servs.</u>, because the highest ranking individuals with final decision making authority, Vlainich and Riccio, made the decisions at issue here.

## SECOND CLAIM
## (Age Discrimination – New York State Human Rights Law)

148.    The TCFD and the District are employers and discriminated against Gramuglia based on his age, by implementing adverse employment actions, including suspensions and alterations to his job responsibilities which disadvantaged him.

149.    Vlainich and Riccio were personally involved in the unlawful discrimination and aided and abetted such unlawful discrimination.

## THIRD CLAIM
## (Age Discrimination - ADEA)

150.    The TCFD and the District are employers and discriminated against Gramuglia based on his age, by implementing adverse employment actions, including suspensions and alterations to his job responsibilities which disadvantaged him.

## FOURTH CLAIM
## (Disability Discrimination – New York State Human Rights Law)

151.    The TCFD and the District are employers and discriminated against Gramuglia based on his actual or perceived disability, by implementing adverse employment actions, including suspensions and alterations to his job responsibilities which disadvantaged him.

152.    Vlainich and Riccio were personally involved in the unlawful discrimination and aided and abetted such unlawful discrimination.

## FIFTH CLAIM
### (Disability Discrimination - ADA)

153.    The TCFD and the District are employers and discriminated against Gramuglia based on his actual or perceived disability, by implementing adverse employment actions, including suspensions and alterations to his job responsibilities which disadvantaged him.

## SIXTH CLAIM
### (Disability Discrimination – Failure to Accommodate - New York State Human Rights Law)

154.    The TCFD and the District are employers and failed to accommodate Gramuglia's actual or perceived disability.

155.    Vlainich and Riccio were personally involved in the unlawful discrimination and aided and abetted such unlawful discrimination.

## SEVENTH CLAIM
### (Disability Discrimination - ADA)

156.    The TCFD and the District are employers and failed to accommodate Gramuglia's actual or perceived disability.

## EIGHTH CLAIM
### (Retaliation – ADA/ADEA)

157.    The TCFD and the District are employers and retaliated against Gramuglia based on "letters and communications with lawyers" which referenced discrimination.

**NINTH CLAIM**
**(Retaliation - New York State Human Rights Law)**

158.    The TCFD and the District are employers and retaliated against Gramuglia based on "letters and communications with lawyers" which referenced discrimination.

159.    Vlainich and Riccio were personally involved in the retaliation.

**TENTH CLAIM**
**(Retaliation – 14th Amendment via Section 1983)**

160.    Vlainich and Riccio, acting under color of state law, retaliated against Gramuglia based on "letters and communications with lawyers" which referenced discrimination. See Vega v. Hempstead Union Free Sch. Dist., 801 F.3d 72 , 91 (2d Cir. 2015).

**REMAINDER OF PAGE INTENTIONALLY BLANK**

**WHEREFORE,** Plaintiff demands judgment against Defendants, where applicable, for all compensatory, emotional, physical, and punitive damages (where applicable), lost pay, front pay, overtime pay, loss of benefits, reinstatement, injunctive relief, liquidated damages (where applicable), statutory damages, and any other damages permitted by law.  It is further requested that this Court grant reasonable attorneys' fees and the costs and disbursements of this action and any other relief to which Plaintiff is entitled.  Plaintiff demands a trial by jury.

Dated: Melville, New York
      May 23, 2025

FAMIGHETTI & WEINICK, PLLC
*Attorneys for Plaintiff*
25 Melville Park Road, Suite 235
Melville, N.Y. 11747
 (631) 352-0050
mbw@fwlawpllc.com

By:    __/s/ Matthew Weinick_____
       MATTHEW WEINICK